**Larry HOPPERTON, Plaintiff,**

v.

**SOUTHWEST OHIO REGIONAL TRANSIT AUTHORITY, et al., Defendants.**

No. C-1-80-503.

United States District Court,
S. D. Ohio, W. D.

April 14, 1982.

James F. Ogden, Covington, Ky., Mark A. Bergman, Cincinnati, Ohio, G. Wayne Bridges, Covington, Ky., for plaintiff.

John S. Wirthlin, William J. Desmond, Cincinnati, Ohio, for defendants.

SPIEGEL, District Judge:

This cause came on for trial to the Court, without the intervention of a jury on March 22–24, 1982. Having duly considered the pleadings, evidence and arguments of counsel, the Court hereby makes the following findings of fact and conclusions of law.

*Findings of Fact*

1. On October 17, 1978, at approximately 3:45 p. m., plaintiff Larry Hopperton, was driving his 1977 Ford pick-up truck, weighing 1½ tons, east on Queen City Avenue in Cincinnati, Ohio. Plaintiff was traveling at a speed of approximately 25–30 miles per hour.

2. At the same time and location, defendant Terry Foley was driving Queen City Metro bus # 948, weighing approximately 12 tons, eastwardly on Queen City Avenue about 70–80 feet behind plaintiff, at a speed of about 30 miles per hour. At all times material hereto, defendant Foley was acting within the scope of his employment as a driver with Queen City Metro.

3. In the vicinity of the 1900 block of Queen City Avenue, an automobile in front of plaintiff slowed abruptly in order to make a turn. Plaintiff stopped suddenly in order to avoid hitting the automobile in front of him.

4. Almost simultaneously, the bus driven by defendant Foley struck the rear of plaintiff's pick-up truck, causing minor damage to the right rear bumper of plaintiff's truck.

5. Upon seeing plaintiff stop, defendant Foley hit the brakes on the bus, but the brakes did not operate properly and only slowed the bus to some extent. The bus was traveling about 15 miles per hour at the moment of impact. Queen City Avenue slopes downhill at the point of the accident.

6. Plaintiff did not see the bus prior to impact. The plaintiff was reaching over in the seat to pick up an object which had rolled onto the floor and his body was twisted sideways when his truck was hit by the bus.

7. Plaintiff and defendant moved their vehicles a few blocks away from the scene of the accident to await the arrival of the police. The accident was investigated by Police Officer Marvin Boone who issued a citation to Queen City Metro Company for bad brakes and failure to have a safety lane sticker.

8. Defendant Foley was not injured in the accident. There was no damage to the Queen City Metro bus.

9. Plaintiff then drove himself to nearby St. Francis Hospital Emergency Room, where he complained of pain in his neck and blurry vision. X-rays were taken of plaintiff's skull and cervical spine, and the results of these x-rays were normal. Plaintiff was given a cervical collar, some medication and released from the hospital.

10. Plaintiff was driven home to Glencoe, Kentucky by a fellow employee of Seta Construction Company.

11. At approximately 3:00 p. m. on the date of the accident, defendant Foley received a radio call from the Queen City Metro dispatcher advising Foley to take his bus to the Western Hills Plaza Shopping Center and "trade-off" his bus for Coach 948. The driver of Coach 948, Curtis Baldwin, had requested another bus because the brakes on 948 felt weak. Baldwin was able to drive the bus from Knolton's Corner to Western Hills Plaza without incident. Foley drove his bus to the shopping center and gave his bus to Baldwin. Baldwin gave Coach 948 to Foley to drive back to the Metro garage. Baldwin warned Foley that Coach 948 had weak brakes. The air pressure on the brakes, however, was good.

12. Foley tested the brakes on Coach 948 several times before leaving the shopping center and believed that they were working normally. Foley believed it was reasonably safe to drive the bus to the garage rather than to have it towed. The decision whether to drive the bus or have it towed was left to the discretion of the driver.

13. Defendant Foley drove Coach 948 approximately three miles in heavy traffic without incident prior to the accident. He made several anticipated stops without any problems.

14. The brake pedal went all the way to the floor when Foley tried to stop the bus to avoid hitting the plaintiff. The brakes did slow the bus, but it did not stop it. Foley would have been able to stop the bus in time if the brakes had been operating properly.

15. Foley did not intentionally, deliberately or purposely cause his bus to strike plaintiff's truck.

16. There were a number of complaints about the brakes on Coach 948 in the weeks prior to the accident. Queen City Metro records show that all the brake problems complained of were immediately corrected.

Records indicate that on October 4, 1978, Coach 948's brakes were relined and adjusted. The brakes were adjusted again on October 10, 1978. On October 16, 1978, the day before the accident, the brakes were adjusted once again, and the bus was road-tested with satisfactory results. Metro's records indicate no further complaints or work performed on Coach 948's brakes until November 4, 1978. There is nothing unusual in the amount of brake work performed on Coach 948.

17. Coach 948 passed a safety lane test on October 18, 1978, the day after the accident. There is no record that the bus's brakes were repaired subsequent to the accident. Not all work performed would necessarily be indicated by the records. Some work was noted only on daily work sheets which were kept only one year and were not available at trial.

18. Coach 948 was driven back to the Metro garage after the accident without incident.

19. The day following the accident, October 18, 1978, plaintiff was treated by his family physician, Dr. Jerry Crabbs of Covington, Kentucky. Dr. Crabbs diagnosed plaintiff as suffering from a strain to his neck and lower back. He observed involuntary muscle spasm in the back, caused by injury. Plaintiff returned to Dr. Crabbs on November 6, 1978. At that time the cervical area was improved and Dr. Crabbs discontinued use of the cervical collar. Dr. Crabbs referred plaintiff to Dr. Norman Adair for x-rays of the spine.

20. X-rays taken by Dr. Adair indicated degenerative arthritis in the lumbosacral area, an old bone injury to plaintiff's cervical spine, some narrowing of the L5–S1 disc space, and injury to plaintiff's dorsal spine at D5, 6 and 7. Dr. Adair was not sure whether this injury was old or new. Dr. Crabbs testified that in his opinion the injury was new because plaintiff had not complained of back pain prior to the accident. We find this evidence to be sufficient proof that plaintiff suffered an injury to the spine as a result of the accident on October 17, 1978.

21. Plaintiff continued to see Dr. Crabbs for several months after the accident and was undergoing physical therapy at St. Elizabeth Hospital. By December of 1978, plaintiff's neck was much better, but his back condition was unchanged. On January 10, 1979 plaintiff's neck was still improving, but his back had improved very little; he continued to have muscle spasms in his back.

22. On February 14, 1978 plaintiff went to the emergency room at St. Elizabeth Hospital. He told the emergency room attendants that he had been doing well on physical therapy until that day, but had experienced a sharp unusual pain in his back when getting out of the car. He complained that the pain was radiating into his right leg. Plaintiff testified that the reason he went to the emergency room was that he had experienced an episode of severe leg pain on February 13, 1979, the day before. We find plaintiff's testimony to be credible in this regard. There was no other explanation offered to explain why plaintiff went to the emergency room that day rather than to Dr. Crabb's office where he was usually seen. His behavior was consistent with the sudden onset of an unusual pain. His statement to the emergency room personnel that he experienced a sharp pain getting out of the car does not contradict his testimony that he experienced radiating pain in his leg the day before.

23. Plaintiff continued to have back pain in the lumbar area and pain radiating into both legs. On February 22, 1978 plaintiff was admitted to St. Elizabeth Hospital by Dr. Crabbs, to determine whether plaintiff had a herniated disc. Dr. Crabbs consulted with Drs. Schmitz and Sheridan, orthopedic surgeons. Electromyographic (EMG) studies conducted on February 23, 1979 were normal. Plaintiff was treated with traction while in the hospital and released on March 1, 1979. Even though the tests were negative, Dr. Crabbs still suspected a herniated disc. It was his opinion that the tests performed were only 80% accurate.

24. Plaintiff continued physical therapy but still had pain in his back and right leg. On March 3, 1979 Dr. Crabbs placed plaintiff on a Stim-Tech unit to control the pain. In May of 1979, Dr. Sheridan placed plaintiff in a lumbosacral corset and told plaintiff not to engage in any physical activity for thirty days. Plaintiff was also taking various anti-inflammatory drugs and pain medication. Plaintiff continued to see Dr. Crabbs until March 19, 1980 without improvement. At that time Dr. Crabbs sent plaintiff to see Dr. Curwood Hunter, a neurosurgeon at the Mayfield Clinic in Cincinnati, Ohio.

25. Plaintiff saw Dr. Hunter on May 23, 1980 and was admitted to Good Samaritan Hospital by Dr. Hunter on July 27, 1980. An EMG and myelogram were performed, both of which were normal. A discogram was then performed and showed a herniated lumbar disc at L5, S1. Dr. Hunter testified that a discogram has less than a 5% margin of error; a myelogram may have a 10% margin of error and EMG, 30–40%. Plaintiff was released and re-admitted on August 5, 1980 for surgery. On August 6, 1980, Dr. Hunter performed a partial hemilaminectomy, removing a herniated disc at L5, S1. Dr. Hunter was able to see the herniated disc during surgery. Plaintiff was released from the hospital in an improved condition on August 10, 1980. His back and leg pain decreased after surgery although some back pain persists. Dr. Hunter was of the opinion that plaintiff's herniated disc was caused by the accident. He recommended an exercise and weight loss program for plaintiff.

26. Dr. Jerry Crabbs testified that in his opinion the plaintiff had a herniated disc which was surgically removed by Dr. Hunter, caused by the accident of October 17, 1978. Dr. Crabbs further testified that plaintiff had early degenerative arthritis which was dormant and which was then aggravated and made symptomatic by the accident.

27. Dr. Robert McLaurin, neurosurgeon, examined plaintiff at the request of defendants on August 11, 1981. Dr. McLaurin testified that he found absolutely no objective evidence of any residual mechanical disturbance in the spine or any residual neurological deficit in the lower extremities. He found no indication of any definite physical disability or impairment. Dr. McLaurin further testified that plaintiff's symptoms prior to the August, 1980 surgery were not consistent with a lumbosacral herniated disc. Dr. McLaurin concluded that the surgery was not medically indicated.

28. In his testimony, Dr. McLaurin identified six indications of a herniated disc: 1) muscle spasm; 2) restriction of motion; 3) problems with straight leg raising; 4) weak muscles, atrophy; 5) absence of reflexes; and 6) loss of sensation. Drs. Hunter and Crabbs found all of these symptoms to exist in plaintiff prior to his surgery in 1980.

29. We find that plaintiff did suffer from a herniated disc caused by the accident on October 17, 1978. The fact that the radiating pain manifested itself some four months later is not unusual or significant; leg pain usually does not occur simultaneously with a herniation but generally manifests itself some months later. We find that the opinion of the treating physician and surgeon are more credible than the opinion of a physician who briefly examined plaintiff twelve months after the surgery took place. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980).

Plaintiff was hit from behind by a 12 ton bus going 15 miles per hour. At the moment of impact, plaintiff's 1½ ton pick-up truck was stopped and plaintiff was twisted sideways in his seat and reaching down to the floor on the passenger side of the vehicle. Even though the property damage was minor it is reasonable to conclude that the impact of a 12 ton bus hitting plaintiff's truck caused a severe jolt to plaintiff's body. We find that this blow to plaintiff at the moment his back was in a twisted position was the proximate cause of plaintiff's herniated disc rather than some twisting motion of plaintiff while getting out of his car several months later, as contended by defendants. This conclusion is fully supported by the medical evidence.

30. At the time of the accident, plaintiff was employed by Seta Construction Company earning $8.97 an hour as a supervisor. Plaintiff began his job with Seta in April of 1978. During good weather, plaintiff worked overtime. The job required plaintiff to do heavy lifting. Plaintiff did not return to his job after the accident and Seta Construction Company went out of business approximately one year later.

31. From May of 1979 to the summer of 1980 plaintiff was engaged in a construction and land development business under the name of B & H, Inc. Plaintiff received an income of $17,100.00 from the business. Plaintiff has earned no other income since the accident.

32. Prior to obtaining employment at Seta Construction Company, plaintiff was employed by Griff's of America, a fast-food chain for approximately ten years. The earnings of the plaintiff in the past were as follows:

| Year | Amount | |
|------|--------|---|
| 1973 | $15,015.00 | |
| 1974 | 16,533.00 | |
| 1975 | 12,443.00 | |
| 1976 | 17,104.00 | |
| 1977 | 15,142.00 | |
| 1978 | 14,292.00 | ($10,554.00 from Seta & $3,752.00 from Taco Bell) |
| 1979 | 10,500.00 | |
| 1980 | 6,600.00 | |
| 1981 | 0 | |
| 1982 | 0 | |

For the years 1973 to 1977, plaintiff's average adjusted gross income was $15,247.40. If plaintiff had not been injured, he could have expected to earn $28,600.00 at Seta, at the rate of $550.00 per week.

33. Plaintiff has a 10% permanent partial disability caused by the accident which reasonably can be expected to decrease his earning capacity.

34. We find that plaintiff reasonably could have returned to some type of work by May 20, 1981. Although he continued to suffer some discomfort in his back, an examination by Dr. Hunter showed no neurological basis for his complaints. Dr. Hunter himself believed that plaintiff should have been able to return to work by this time but recognized that plaintiff felt he was unable to do so. Plaintiff may always have some pain in his back but his condition is no longer serious enough to prevent him from engaging in some type of employment. It is uncertain whether he will ever be able to return to heavy manual labor.

35. Plaintiff incurred medical expenses in the amount of $8,828.75 as a result of this accident. Plaintiff is not expected to incur any medical expenses in the future as a result of this accident.

36. Plaintiff was not contributorily negligent.

■ 37. Plaintiff has failed to prove by a preponderance of the evidence that the conduct of any of the defendants was intentional, reckless, wanton, willful or gross misconduct and is not, therefore, entitled to any award of punitive damages. *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 327 N.E.2d 654 (1975).

■ 38. Having determined that, as a result of defendant's ordinary negligence plaintiff suffered an injury to his back and neck, including a herniated disc that required surgery to remove, and suffered a permanent partial disability of 10%, we conclude that plaintiff is entitled to recover the following damages from the defendants:

a) Medical expenses of $8,828.75;

b) The full amount of plaintiff's lost wages until May 20, 1981, less the amount plaintiff earned from his construction business in 1979–80; The average of plaintiff's salary was $550.00 per week. We recognize that Seta Construction Company went out of business in 1979 but find that plaintiff likely would have been able to find similar employment. Defendants are, therefore, liable for plaintiff's lost wages in the amount of $53,300.00.

128 weeks x $550.00 = $70,400.00
less 17,100.00
$53,300.00

c) The Court further finds that there is a reasonable likelihood that plaintiff will suffer a loss of future earnings due to his 10% permanent disability. We find,

therefore, that plaintiff is entitled to 10% of the income he could have expected to earn were it not for the accident.

Plaintiff has a work life expectation in heavy construction of 22 years, from May 20, 1981 to age 65. At the rate of $550.00 per week × 1,144 weeks (22 years) plaintiff could expect to earn $629,200. Ten percent of $629,200 is $62,920. In order to make a reasonable adjustment for the present use, interest free, of money representing a lump sum payment, we have reduced this amount to its present value. We find that if invested, this amount of money could be reasonably expected to earn 10% interest. We have, therefore, reduced the amount of loss of future earnings to $56,629.00.

($62,920.00 – $6,292.00 = $56,628.00)

d) We find further that plaintiff has suffered considerable pain and is entitled to be compensated for his past pain and suffering in the amount of $1,000 per month until January 1, 1981, at which time his pain was much diminished for a total of $26,500.00.

($1,000.00 × 26.5 = $26,500.00)

e) We also find that plaintiff can reasonably be expected to suffer some pain in the future although to a lesser extent, for which he is entitled to recover $15,000.00.

The Court finds, therefore, that defendants' are liable to the plaintiff for their ordinary negligence that was the proximate cause of plaintiff's injuries in the amount of $160,256.75.

| $ 53,300.00 | – | lost wages |
| 56,628.00 | – | present value of future lost earnings |
| 26,500.00 | – | past pain and suffering |
| 15,000.00 | – | future pain and suffering |
| 8,828.75 | – | medical expenses |

$160,256.75

### Conclusions of Law

1. Jurisdiction over this matter is by way of diversity and is not disputed. 28 U.S.C. § 1332.

2. Defendants, having conceded that Foley's ordinary negligence was the proximate cause of the accident are liable for plaintiff's injuries and damages as has been established by a preponderance of the evidence.

3. Defendants Queen City Metro and Southwest Ohio Regional Transit Authority are jointly and severally liable with defendant Foley under the doctrine of *respondeat superior*.

4. Punitive damages may not be recovered under Ohio law unless plaintiff shows actual malice, either express or implied, by a preponderance of the evidence. Although actual malice may be inferred from gross negligence or from conduct which it is intentional, reckless, wanton or willful, the evidence does not support such a finding in this case. *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 327 N.E.2d 654 (1975).

5. Because the amount the Court has arrived at to fairly compensate plaintiff for his injuries is within the amount prayed for in the complaint, we need not rule on plaintiff's motion to increase the demand.